**The relief described hereinbelow is SO ORDERED.**

**Signed May 06, 2024.**



**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| **ARBORETUM CROSSING, LLC,** | § | **Case No. 21-10546-cgb** |
| | § | **Chapter 7** |
| Debtor. | § | |

## OPINION ON CHAPTER 11 TRUSTEE COMPENSATION

### Introduction

Prior to conversion of this case to chapter 7, the chapter 11 trustee sold the debtor's main asset, a shopping center, under time pressure and with significant complicating factors, resulting in a surplus to the estate. She now seeks fees and expenses for her work as the chapter 11 trustee. The debtor agrees that the trustee is entitled to compensation but disagrees as to the amount.

The Court holds that the correct approach to awarding chapter 11 trustee fees is to begin with the "commission" amounts specified in section 326(a) of the Bankruptcy Code and then use the analysis laid out in section 330(a)(3) to adjust that amount downward as appropriate. Under the somewhat unusual circumstances of this case, where the trustee requested substantially below the "commission" amount, the Court's preferred approach yields the same result as the approach taken by some other courts, which is to start with a "lodestar" calculation and adjust it based on the section 330(a)(3) analysis, subject to the section 326(a) limitation.

1

Under either approach, the fees requested are reasonable given the nature of this case as a liquidating chapter 11, the circumstances surrounding the sale, and fee awards to other chapter 11 trustees in this district. The Court will grant the trustee's fee application and award her requested fees and expenses.

## Procedural Background

On January 4, 2024, Laurie Dahl Rea (the "Trustee") filed the First and Final Application of Laurie Dahl Rea, Chapter 11 Trustee, for Allowance of Fees and Reimbursement of Expenses (the "Application"), seeking fees of $1,000,000.00 and expenses of $7,303.27.[1]

Arboretum Crossing, LLC (the "Debtor") filed an objection to a portion of the Trustee's fees.[2] It did not contest the facts asserted but argued that $1 million was an unreasonable award because it would represent a billing rate of over $1,800 an hour. It asserts that the Trustee's fees should be limited to $440,000. According to the Debtor, such an amount would equate to an hourly rate of $800, which is significantly more than the standard rate the Trustee charges for her work as an attorney, $650 an hour.

In response, the Trustee reasserted that the requested fees are reasonable under section 330(a)(3) and the Fifth Circuit's *Johnson* factors.[3] When discussing the customary fee factors, she noted that chapter 11 trustees in similar affiliate cases in this district were awarded fees where the effective hourly rates were higher than what she requests in this case.

On February 26, 2024, the Court held a hearing on the Application. During the hearing, the Debtor objected to the Trustee's evidence regarding chapter 11 trustee fees awarded in affiliate cases, arguing that each case is different and that fees awarded in other cases should not be considered in this case. In response, the Trustee noted that the affiliate cases were also single asset real estate cases and had the same principal. She argued that what the trustees received in those cases is relevant to the Court's consideration of the Application. The Court agreed and took judicial notice of the chapter 11 trustee compensation in the affiliate cases.

At the conclusion of the hearing, the Court took this matter under advisement.

---

[1] Application, ECF No. 407.
[2] Obj. to Application, ECF No. 416.
[3] Reply to Obj. to Application, ECF No. 427.

## Jurisdiction and Authority

The Court has jurisdiction pursuant to the order of reference in this district and 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). The Court has constitutional authority to determine this matter because it arises from the claims allowance process.[4]

## Factual Background

The Debtor filed this case in July 2021 under chapter 11 of the Bankruptcy Code. This case is one of many affiliate cases filed by the Debtor's representative, Nate Paul. The Debtor's main asset was a retail strip center located in Austin, Texas, known as "Arboretum Crossing." When the Debtor filed the case, Arboretum Crossing had seven commercial tenants but most of the tenant spaces were vacant. The Debtor owed around $32 million to its pre-petition lender. No payments were made to the pre-petition lender during the bankruptcy case.

A few months into the case, the pre-petition lender filed a motion seeking relief from the automatic stay.[5] To resolve the motion, the Debtor and the pre-petition lender entered into an agreed order wherein the Debtor agreed to pay off the pre-petition lender's claim in full by February 14, 2022, or the pre-petition lender would be allowed to file a deed in lieu of foreclosure.[6] A few days before the February deadline, the Court allowed the Debtor to borrow $36.55 million (the "DIP Loan") from Kennedy Lewis Investment Management LLC or its affiliates (the "DIP Lender").[7] The pre-petition lender was paid approximately $34.5 million in full satisfaction of its debt and the Debtor received the remaining proceeds.[8] In exchange for the loan, the DIP Lender was given a lien on the strip center and all of the Debtor's other assets.[9] The maturity date of the DIP Loan was February 11, 2023, twelve months after the loan closed.[10]

A few weeks after the DIP Loan closed, the United States Trustee (the "UST") filed a motion seeking conversion of the case to chapter 7 or dismissal of the case because the Debtor had neither filed monthly operating reports nor paid its UST

---

[4] *Stern v. Marshall*, 564 U.S. 462, 474–78 (2011).
[5] Mot. for Relief from Stay, ECF No. 26.
[6] Agreed Order, ECF No. 48.
[7] Order Authorizing Post-Petition Financing, ECF No. 82.
[8] *Id.* at 5.
[9] *Id.* at 16.
[10] *Id.* at 65.

fees.[11] Shortly thereafter, the Court entered an order to show cause why a chapter 11 trustee should not be appointed because of the lack of monthly operating reports and because there had been unauthorized post-petition cash transfers in an affiliate bankruptcy case.[12] The Debtor offered to appoint a chief restructuring officer instead, and the Court agreed to the appointment but continued the hearing on the UST's motion to convert or dismiss.[13] Due to persistent issues in the case, the Court directed the appointment of a chapter 11 trustee at the continued hearing. The Trustee was appointed chapter 11 trustee on May 2, 2022.[14]

According to her testimony, the Trustee has been a bankruptcy attorney for twenty-eight years and has served as a chapter 7 panel trustee in the Northern District of Texas since 2019. During her career, she has also represented many trustees and has recently served as a chapter 11 trustee in several cases.

Upon her appointment as chapter 11 trustee in this case, the Trustee determined that a sale of the strip center was the best way to maximize the value of the estate before the DIP Lender foreclosed on its lien. While the case was in chapter 11, the Trustee (a) secured the Debtor's funds and protected the property; (b) hired professionals to administer the case; (c) maintained a good relationship with the DIP Lender and convinced it to delay foreclosure for several months to accommodate a sale of the property; (d) marketed the strip center for sale and, after a prolonged sale process, closed the sale; (e) analyzed the tax implications of the sale; and (f) operated the property as a going concern throughout the marketing and sale process.

These tasks were complicated by various factors, including (a) dealing with a strip center in a declining state, with vacant spaces, deferred maintenance issues, upset tenants, vandalism, and a space that was used as shelter by some unhoused people; (b) problems securing insurance due to the vacancy rates, the state of the property, time pressure, and the DIP Lender's lien on all the cash in the estate, which led to the strip center being uninsured for at least a month; (c) disputes with the Debtor over the broker's commission;[15] (d) conflicts over a Reciprocal Easement

---

[11] Mot. to Convert, ECF No. 94.

[12] Order to Show Cause, ECF No. 97.

[13] Order Appointing Chief Restructuring Officer, ECF No. 105.

[14] Order Appointing Trustee, ECF 119.

[15] According to her uncontroverted testimony, the Trustee negotiated a structure where the broker would get 1% of the sale price up to a certain amount and then 7% of a sale price over that amount. The Debtor objected to this structure and wanted a 3% commission no matter the sale price. The

Agreement with neighboring property; and (e) difficulty negotiating an asset purchase agreement with Stockdale Capital Partners, LLC (the "Third-Party Buyer"). Another complicating factor was that the Trustee found it necessary to impose a right of first refusal ("ROFR") procedure to prevent Nate Paul or an affiliate from bidding up the sale price and then failing to close, leaving the backup bidder unwilling to close at its bid price, which happened in at least two other affiliate cases.[16] The procedure was particularly necessary because the Trustee had to secure a quick sale due the impending DIP Loan maturity. Under the ROFR procedure, a Nate Paul-related entity could not bid at the auction, but it could provide notice at the sale hearing that it would pay one million dollars more than the highest bid and close within 10 days.

As of the beginning of November 2022, about three months before the maturity date of the DIP Loan, the Trustee had no bidders but was negotiating with the Third-Party Buyer. Due to the difficulties getting the Third-Party Buyer to agree to the asset purchase agreement, the auction and sale hearing had to be reset eight times, with the final hearing conducted on February 1, 2023.

After the sale hearing had been reset several times, the DIP Lender filed a motion for relief from stay in January 2023 because of the approaching maturity date and prolonged sale process.[17] Several tenants and the Trustee objected to the lift stay motion and the parties ultimately reached an agreement that allowed the DIP Lender to post the property for foreclosure in March 2023 for an April foreclosure sale.[18]

To get to the final sale hearing in time, the Trustee had to navigate disputes between the tenants and the Third-Party Buyer, who wanted to purchase the property free of all tenants' possessory interests, which the Court would not allow.[19] The Trustee, the Third-Party Buyer, and the tenants ultimately came to an agreement after mediation.

---

Trustee prevailed and the broker was paid around $591,000. Under the Debtor's proposal, the commission would have been a little over $1.4 million and the surplus in this case would have gone to the broker.

[16] *See WC South Congress Square LLC*, No. 20-11107, Notice of Non-Closing of Sale, ECF No. 351 (notifying that Rising Tide Investments, LLC, an affiliate of the Debtor, failed to close the sale); *WC 3rd and Trinity, LP*, No. 21-10252, Notice of Failure of Winning Bid to Close, ECF No. 262 (same).

[17] Mot. for Relief from Stay, ECF No. 285.

[18] Trustee Resp. to Mot. for Relief from Stay, ECF No. 306; Tenants' Obj. to Mot. for Relief from Stay, ECF No. 308; Agreed Order Granting Mot. for Relief from Stay, ECF No. 309.

[19] Order Granting in Part Denying in Part Relief in Supplement to Sale Mot., ECF No. 288.

At the sale hearing, the Trustee selected the Third-Party Buyer, with its $47.5-million bid, as the prevailing bidder.[20] But a Nate Paul affiliate, South Congress Capital, LLC (the "Affiliate"), exercised the ROFR and was supposed to close on the property for $48.5 million by February 13, 2023, about a month before the DIP Lender would be allowed to post the property for foreclosure.[21]

As in the other affiliate cases, the Affiliate failed to close the sale and the Trustee filed a notice of the failure to close on February 15, 2023.[22] The next day, the Debtor and the Affiliate appealed the Court's sale order.[23] Due to the pending appeal, the Third-Party Buyer refused to close the sale at $47.5 million.

By that point, the DIP Lender was pressing to foreclose and would no longer authorize the Trustee to use its cash collateral for repairs required by the insurance company. Because these repairs were not made, the insurer cancelled the general liability insurance on the property. Around this same time, wires were stripped from the security lights on the property and the parking lot was dark. Having received reports of vandalism and theft at other affiliate properties, the Trustee hired a security company to try and keep the property safe.

In light of the pending appeal, the inability to achieve a sale to the Third-Party Buyer, the cancellation of insurance, and the quickly approaching April foreclosure—which would likely leave the estate deeply administratively insolvent—the Trustee filed a motion to convert the case to chapter 7.[24] At the same time, the Trustee filed a Motion to Determine Tax Liability because she could not get documentation from the Debtor to show that it was a disregarded entity for tax purposes and was unsure if she was responsible for paying taxes for the Debtor.[25] Ultimately, the tax litigation was resolved with an agreed order that provided that the Debtor would be considered a disregarded entity,[26] but, according to the Trustee, they were only able to reach that agreement with the IRS because the IRS was able to compel the Debtor, the Debtor's owners, and the owners of those owners to make sure the Debtor was a single-member limited liability company.

---

[20] Order Approving Mot. to Sell at 5, ECF No. 310.
[21] *Id.*
[22] Notice of Failure to Close, ECF No. 314.
[23] Notice of Appeal, ECF No. 315.
[24] Mot. to Convert, ECF No. 323.
[25] Mot. to Determine Tax Liability, ECF No. 322.
[26] Agreed Order, ECF No. 393.

Fortunately, after negotiation with the Trustee's counsel, the Debtor and the Affiliate agreed to dismiss their appeal,[27] and the Third-Party Buyer purchased the property for $47,500,000 on March 14, 2023.[28] From the sale proceeds, the Trustee was able to pay the DIP Lender's $44,562,266.20 claim and several tenant cure claims, leaving proceeds of $1,763,628.99.[29]

A few weeks later, the case converted to chapter 7 and the Trustee was appointed as chapter 7 trustee.[30] When asked why she did not convert the case sooner, the Trustee testified that she was worried that converting to chapter 7 would harm the value of the property because any sale would appear to be an act of desperation. She also noted that, in chapter 7, she would need Court approval before spending estate funds to operate the Debtor, whereas in chapter 11, she only needed approval from the DIP Lender—who had a lien on the Debtor's cash—to pay expenses. In addition, she chose not to convert the case to reduce administrative expenses because she knew her fee would be higher under chapter 7. Indeed, had the Trustee converted this case to chapter 7 before the sale, she likely would have been entitled to $1,433,276.83 in fees under section 326(a).

Instead, the Trustee kept the case in chapter 11 and now requests $1 million—making the effective hourly rate for her work as chapter 11 trustee about $1,800. She said that her billing rate as an attorney is $650 an hour but that she does not have an hourly rate for her work as a trustee because trustees are generally compensated based on distributions made from the assets of the estate.

To decide on a reasonable fee for her work as chapter 11 trustee in this case, the Trustee testified that she looked at similar affiliate cases. According to her analysis, the chapter 11 trustee in *In re WC Met Center, LLC* was paid an effective hourly rate of about $3,500 and the chapter 11 trustee in *In re WC Braker Portfolio, LLC* was paid an effective hourly rate of about $2,400. Todd Headden, debtor's counsel in the *WC Braker* case, testified about the complexities in that case and the chapter 11 trustee's compensation. There, the fees that would have been payable under section 326(a) were around $3.5 million and the trustee requested $2.5 million. Ultimately, the parties agreed to a fee of $1.5 million plus a $250,000 "kicker" when she generated more funds for the estate.

---

[27] Order Dismissing Bankruptcy Appeal, ECF No. 334.
[28] Notice of Sale Closing, ECF No. 335.
[29] Trustee's Final Report at 9, ECF No. 352 (showing proceeds deposit).
[30] Order Converting Case to Chapter 7, ECF No. 342.

# Legal Standard

**A. To determine chapter 11 trustee compensation, the Court begins with the commission amount of section 326(a) and then adjusts it based on "all relevant factors" as instructed by section 330(a)(3).**

The Trustee seeks fees for her work as a chapter 11 trustee under sections 326(a) and 330 of the Bankruptcy Code. It is her burden to defend her fees as reasonable.[31]

The legal scheme governing chapter 11 trustee compensation is complicated because it overlaps, in part, but not entirely, with the more familiar approaches governing compensation for attorneys and similar professionals on the one hand and chapter 7 trustees on the other.

Section 330(a)(1) is the general provision allowing the court to compensate numerous different providers of services in a bankruptcy proceeding:[32]

> [T]he court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103—
>
> > (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
> > (B) reimbursement for actual, necessary expenses.

For some providers of services—including chapter 11 trustees, but not chapter 7 trustees—courts must analyze the reasonableness of their fees based on "all relevant factors, including" those specified in section 330(a)(3):[33]

> In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

---

[31] *Sylvester v. Chaffe McCall, L.L.P. (In re Sylvester)*, 23 F.4th 543, 549–50 (5th Cir. 2021).

[32] 11 U.S.C. § 330(a)(1).

[33] 11 U.S.C. § 330(a)(3).

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field;[34] and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

Subsection (a)(4) prevents the court from allowing fees for "(i) unnecessary duplication of services; or (ii) services that were not—(I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case."[35]

Section 330(a)(7) somewhat mysteriously states: "In determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326."[36]

Finally, section 326(a) sets the upper limit on the compensation available to trustees, calculated as a commission based on distributions[37]:

In a case under chapter 7 or 11, other than a case under subchapter V of chapter 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all

---

[34] Whether subsection (E) applies to chapter 11 trustees is unclear. See analysis below concerning whether trustees are "professional persons."

[35] 11 U.S.C. § 330(a)(4).

[36] 11 U.S.C. § 330(a)(7).

[37] 11 U.S.C. § 326(a).

moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

Thus, according to the statutory framework, a court may award to a chapter 11 trustee:

1. "reasonable compensation for actual, necessary services" and "reimbursement for actual, necessary expenses," § 330(a)(1);
2. so long as the services were not unnecessarily duplicative and were both reasonably likely benefit the estate and necessary to its administration, § 330(a)(4);
3. "taking into account all relevant factors, including" those laid out in section 330(a)(3); and
4. "treat[ing] such compensation as a commission, based on section 326," § 330(a)(7).

The last point is puzzling: what does section 330(a)(7) mean when it says that "the court shall treat such compensation as a commission, based on section 326"? Does it mean merely that the section 326 amounts are a cap to a trustee's reasonable compensation? Or is the idea that the Court should presumptively treat the section 326 commission as the appropriate amount of compensation? And why does section 330(a)(7) apply to both chapter 7 and chapter 11 trustees, while section 330(a)(3) does *not* apply to chapter 7 trustees?

The case law is generally sparse on these questions, but the Fifth Circuit has provided some guidance, holding that "the percentage amounts listed in Section 326 are presumptively reasonable for Chapter 7 trustee awards."[38]

The Fifth Circuit reached this result in *JFK Capital Holdings*, based on careful and historically informed statutory analysis. In 2005, Congress removed chapter 7 trustees from the list of professionals to whom section 330(a)(3) applies, and it also added section 330(a)(7). The Fifth Circuit stated that its "interpretation is guided by the nature of a commission-based award [post-2005 amendments] contrary to a compensation-based award [pre-2005 amendments]."[39] The court approved of the reasoning of a Wisconsin federal district court, which found that a presumptive-commission approach would best "account for the removal of

---

[38] *Lejeune v. JFK Cap. Holdings, L.L.C. (In re JFK Cap. Holdings, L.L.C.)*, 880 F.3d 747, 753 (5th Cir. 2018).
[39] *Id.* at 754.

Chapter 7 trustees from the reasonableness criteria provided in Section 330(a)(3),"[40] as well as for section 330(a)(7), which "direct[s] courts to treat the trustee's compensation as a commission."[41] After surveying the legal definitions of the terms "commission" and "compensation," the Fifth Circuit explained that: "While compensation denotes a proportionality or connection between benefits received and services rendered, the shift to a commission-based approach signals congressional intent to award fees based on percentage."[42] Thus, it criticized the approach taken by the district court, which, rather than presuming the validity of the section 326(a) commission amount, required the court to evaluate whether that amount was "reasonable compensation *only* for actual and necessary services."[43] That approach required the sort of "reasonableness analysis" that "would tend to mirror the section 330(a)(1) factors."[44] Thus the Fifth Circuit rejected it. Instead, the Fifth Circuit held that the commission approach should govern absent "exceptional circumstances," cautioning that "'exceptional' is the key."[45]

The Fifth Circuit also criticized the lower court's reading of section 330(a)(7) as "not signaling a standard commission rate to be applied in every case but rather a maximum which the court may not exceed."[46] It stated that "[t]his interpretation of 'based on' [in section 330(a)(7)] renders the language superfluous . . . because Section 330(a)(1) already requires awards to be 'subject to Section 326[.]' Because a different word is used in each provision, we assume that different meanings were intended."[47]

Although it involves chapter 7 trustee fees, *JFK Capital Holdings* sheds some light on chapter 11 trustee fees. As noted, *JFK Capital Holdings* states that, because section 326's cap already applies to both chapter 7 and chapter 11 trustee compensation,[48] the "based on" of section 330(a)(7) must—in order to avoid an interpretation that would make it superfluous—do something other than merely

---

[40] *Id.* at 753 (citing *Mohns, Inc. v. Lanser*, 522 B.R. 594, 599 (E.D. Wis. 2015)).

[41] *Id.* (quoting *Mohns*, 522 B.R. at 599).

[42] *Id.* at 754.

[43] *Id.* at 753 (quoting *In re JFK Cap. Holdings, LLC*, No. 15-cv-6719, 2016 WL 10879387, at *5 (E.D. La. Aug. 15, 2016)).

[44] *Id.* at 756.

[45] *Id.*

[46] *Id.* at 755.

[47] *Id.* (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004)).

[48] *See* 11 U.S.C. § 326(a) (stating that the compensation to chapter 7 and chapter 11 trustees is "not to exceed" the percentages specified); § 330(a)(1) (stating that the court's fee awards to trustees are "subject to section[] 326").

impose a cap.[49] For this reason, the Court respectfully disagrees with courts that have interpreted section 330(a)(7) merely as imposing section 326 commissions as a cap on chapter 11 trustee compensation.[50]

On the other hand, because chapter 11 trustees—unlike the chapter 7 trustees at issue in *JFK Capital Holdings*—are *not* excluded from section 330(a)(3)'s reasonableness analysis, then "based on section 326" cannot mean "treating the section 326 commission as presumptively reasonable" as it does for chapter 7 trustees.

So what does "based on section 326" mean for chapter 11 trustees? Under the reasoning above, it must be something between a mere cap and a presumptively reasonable commission. It is possible to imagine that middle ground, with the section 326 commission serving as a baseline or starting point that is then adjusted pursuant to the section 330(a)(3) analysis. In fact, this appears to be what the *Mohns* district court, whose approach to chapter 7 trustee compensation was generally approved by the Fifth Circuit in *JFK Capital Holdings*, contemplated as applying in the chapter 11 context: "[I]n the case of a Chapter 11 trustee, the court should follow § 330(a)(7) and calculate the commission pursuant to the formula in § 326. Then, the court should adjust the commission by applying the § 330(a)(3) factors."[51] This approach should produce a result that is "based on" section 326's percentages while also "consider[ing] the nature, the extent, and the value of [the trustee's] services, taking into account all relevant factors," as section 330(a)(3) instructs.

Granted, as *JFK Capital Holdings* suggests, a "commission" is usually a fee based on set percentages rather than actual time or service. So the very idea of approaching chapter 11 trustee compensation as a commission but then weighing it according to the section 330(a)(3) factors is somewhat uncomfortable—neither commission nor compensation, neither fish nor fowl. But the Court believes that this middle way makes the best sense of the statute and is most faithful to the interpretive principles set forth in *JFK Capital Holdings*. Accordingly, the Court holds that the starting point for chapter 11 trustee compensation should be the section 326 commission, which should then be subjected to scrutiny according to the

---

[49] *JFK Capital Holdings*, 880 F.3d at 755.

[50] *See, e.g.*, *In re WC Met Center, LLC*, 645 B.R. 857, 861 (Bankr. W.D. Tex. 2022) (interpreting section 330(a)(7) as a cap on chapter 11 trustee compensation); *In re Virgin Offshore U.S.A., Inc.*, No. 11-350898, 2015 WL 350898, at *3 (Bankr. E.D. La. Jan. 26, 2015) (same).

[51] *Mohns*, 522 B.R. at 599 n.1.

section 330(a)(3) analysis rather than treated as presumptively reasonable as it is for chapter 7 trustees. This can be called the "adjusted-commission" approach.

This holding emerges from the Court's interpretation of the statute and not from a policy judgment. But some context may help explain why Congress might have chosen to give both a commission-based and a compensation-based aspect to chapter 11 trustee fees. The role of chapter 11 trustees can vary considerably from case to case. Unlike chapter 7 proceedings, which are nearly always liquidations, chapter 11 proceedings can range from straightforward liquidations (sell assets and distribute proceeds) to true reorganizations (impose a new capital structure with rights distributed according to the absolute priority rule) to various hybrid outcomes with some liquidation and some reorganization aspects.

Chapter 11 trustees sometimes play a role that is all but indistinguishable to that of chapter 7 trustee, liquidating an estate and distributing the proceeds. The Trustee in this case largely filled that role, and then of course she actually became the chapter 7 trustee when the case converted to chapter 7.

In other cases, chapter 11 trustees play the role of caretakers of an ongoing business, managing it through the bankruptcy process, perhaps reorganizing it and handing it over to new management or selling it as a going concern. In such cases, their role might look more like that played by other estate professionals, such as the "chief restructuring officers" and other financial or legal professionals who shepherd companies through chapter 11. A more compensation-based approach (as always, capped by the section 326(a) commission) might make more sense in such cases. Chapter 11 cases are often larger cases with larger distributions as well. More liberal downward adjustments from the commission amount might be warranted in cases where the distributions could yield extremely large payments to trustees.[52]

---

[52] For example, distributions can be very large when there are refinanced debt instruments involved in the capital structure. A commission-based approach might yield outsized fee awards that would be inappropriate—and yet might or might not be so inappropriate as to overcome the "presumptively reasonable" standard.

It is worth bearing in mind that a commission-based approach can also sometimes lead to awards—for both chapter 7 and chapter 11 trustees—that have been criticized as too low. For instance, because the statute calculates the commission based on "all moneys disbursed or turned over in the case by the trustee to parties in interest," when the consideration that is disbursed is not "moneys," trustees may find themselves receiving little in return for their efforts. *See, e.g.*, *Staiano v. Cain (In re Lan Assocs. XI, L.P.)*, 192 F.3d 109 (3d Cir. 1999) (where property sold for credit bid rather than cash, sale price is omitted from calculation of trustee's commission). Insofar as this

Under Congress's chosen regime, a court can take all of these factors into account in deciding whether and how to adjust the commission based on the facts of the case.

**B.  Under the alternative approach taken by some courts, the analysis of chapter 11 trustee compensation begins with a "lodestar" calculation that can then be adjusted based on the section 330(a)(3) analysis, subject to the section 326(a) cap.**

As noted above, some courts have taken a different approach, interpreting section 330(a)(7) as a reiteration of the fact (already established by both section 326(a) itself as well as section 330(a)(1)) that chapter 11 trustees' compensation is capped by the commission amounts of section 326(a). Thus, rather than beginning with the commission amount and adjusting it downward as needed—which this Court believes is the correct approach—these courts focus their analysis entirely on the section 330(a)(3) reasonableness analysis. This analysis is very familiar from the consideration of fees of other professionals whose compensation is entirely independent of any commission. This can be called the "adjusted-compensation" approach.

As the Fifth Circuit has explained, this analysis first requires courts to conduct a "lodestar" calculation.[53] To determine the lodestar amount, courts take "the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work."[54] After calculating the lodestar amount, bankruptcy courts then have "considerable discretion"[55] to adjust the lodestar up or down based on "all relevant factors" as instructed by section 330(a)(3). Some factors weigh more heavily than others because some are already included in the lodestar calculation.[56]

Out of an abundance of caution, the Court will engage in this alternative analysis below. In this case, because the Trustee here has requested substantially less than the section 326 commission, and because her performance was strong under the

---

[53] is a problem, it is for Congress and not the courts to address, but it seems worth noting that a more commission-based approach can lead to low awards as well as to large ones depending on the facts and circumstances of a given case.

[53] *CRG Partners Grp., L.L.C. v. Neary (In re Pilgrim's Pride Corp.)*, 690 F.3d 650, 654–55 (5th Cir. 2012), *as revised* (Aug. 14, 2012).

[54] *Id.* at 655 (quoting *Lawler v. Teofan (In re Lawler)*, 807 F.2d 1207, 1211 (5th Cir. 1987)).

[55] *Id.* at 656 (quoting *In re Cahill*, 428 F.3d 536, 540 (5th Cir. 2005)).

[56] *Id.*

circumstances, even under this alternative approach, as analyzed below, the Trustee is entitled to her requested compensation.

### C. The *Johnson* factors are among the "relevant factors" to be considered by the Court in analyzing chapter 11 trustee compensation.

Under either of the approaches discussed above, the Court must determine which are the "relevant factors" to consider under section 330(a)(3). Some courts appear to have looked only to the factors explicitly enumerated in section 330(a)(3) (with the exception of subsection (E)),[57] while others[58] have added the additional factors from Fifth Circuit's opinion in *Johnson v. Georgia Highway Express (In re Johnson)*, commonly called the *Johnson* factors.[59]

The rationale for omitting consideration of the *Johnson* factors and of subsection (E) of section 330(a)(3) may be that these apply only to "professional persons" or "professionals," and that term may not—or may not always—include a chapter 11 trustee.

Of course, a chapter 11 trustee would generally be considered a professional as that term is used within the legal field. *Black's Law Dictionary* defines a professional as "[s]omeone who belongs to a learned profession or whose occupation requires a high level of training and proficiency."[60] Trustees usually belong to a learned profession, such as law or accounting, although they are not technically

---

[57] *See, e.g.*, *Virgin Offshore*, 2015 WL 350898, at *3 (considering "all but one of the lodestar factors enumerated in subsection (a)(3)" and not discussing the *Johnson* factors); *In re JLLCM, Inc.*, No. 04-83164, 2006 WL 6508475, at *4 (Bankr. N.D. Tex. July 20, 2006) (applying only the factors in subsection (a)(3)).

[58] *See e.g.*, *In re WC Met Center, LLC*, 645 B.R. at 861–64.

[59] The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Johnson v. Ga. Highway Express (In re Johnson)*, 488 F.2d 714, 717–19 (5th Cir. 1974)).

[60] *Professional*, BLACK'S LAW DICTIONARY 1403 (10th ed. 2014).

acting as lawyers or accountants.[61] In any case, even trustees who may not technically be members of a "learned profession" are almost always acting in a role that "requires a high level of training or proficiency." Trustees may, for instance, have significant experience in management consulting, finance, or in businesses related to that of the debtor.

Reflecting this commonsense understanding of the term, the Fifth Circuit has referred to trustees as professionals, and thus, the *Johnson* factors developed by the Fifth Circuit should apply to consideration of their compensation.[62] Of course, as noted in the preceding sections, there are some differences in the particular statutory framework applicable to chapter 7 and chapter 11 trustees, and the factors may fit into each framework somewhat differently. But the factors should be considered.

As for section 330(a)(3)(E), whether or not courts must apply it to trustees is not an easy question. The Bankruptcy Code does not define professionals or professional person explicitly. Section 327, which is titled "Employment of professional persons," seems to sweep in a significant number of providers of services in bankruptcy proceedings. It provides that "the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons."[63] Thus, "professional persons" seems to include service providers such as "attorneys, accountants, appraisers, auctioneers," although that list is not exclusive.[64] It is not clear from this section whether in addition to being able to hire "professional persons," the trustee is also such a person.

In section 330(a)(3), the Bankruptcy Code appears to exclude trustees—or, perhaps more accurately, professionals when they are acting as trustees—from the category of "professionals." Section 330(a)(3) discusses "reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person," and then subsection (E) states, as a factor to be considered in such compensation: "with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field." Subsection (E)

---

[61] 11 U.S.C. § 328(b) (noting that trustee, if also serving as attorney for the estate, cannot be compensated in that capacity for work within the scope of the "statutory duties" of the trustee); *In re King*, 546 B.R. 682, 696 (Bankr. S.D. Tex. 2016) (quoting 28 C.F.R. § 58.3) (noting qualifications for serving as trustee).

[62] *See, e.g.*, *JFK Capital Holdings*, 880 F.3d at 752 ("Section 330(a) governs compensation for various categories of bankruptcy court professionals, including Chapter 7 trustees.").

[63] 11 U.S.C. § 327(a).

[64] Courts have elaborated various tests for determining which service providers meet the standard of "professional" and therefore must be retained under section 327. *See, e.g.*, *In re First Merchs. Acceptance Corp.*, No. 97-1500, 1997 WL 873551, at *3 (D. Del. Dec. 15, 1997).

seems clearly intended to apply only to a subset of those otherwise within the scope of section 330(a)(3). The most natural reading is that it excludes trustees and examiners.

That said, the statutory instruction is the Court should consider "all relevant factors." While the Code then prescribes some factors that must be "include[ed]," one of the Bankruptcy Code's rules of construction is that "'includes' and 'including' are not limiting,"[65] and thus the statute leaves determination of what other factors might be relevant to the courts. One can readily imagine circumstances in which board certification or other demonstration of skill and experience in bankruptcy would be "relevant" to consideration of the trustee's compensation (although it might not always be so). Thus, while the statute appears not to *require* courts to consider section 330(a)(3)(E) with respect to trustees, it certainly does not *bar* such consideration—it merely requires a court to go through the extra step of determining whether this factor is relevant. For reasons discussed in detail below, in light of the complicated bankruptcy law issues that the Trustee had to navigate in making crucial business decisions in this case, the Court believes it is relevant here and will consider it.

## Analysis

To begin, the parties do not dispute, and the Court easily finds, that the Trustee's requested compensation is for actual and necessary services and expenses, as required by section 330(a)(1), and that the services performed were not duplicative, were reasonably likely to benefit the estate, and were necessary to the administration of the case, as required by section 330(a)(4).

The section 362(a) cap is also not at issue. According to the Trustee's calculations, the maximum commission she could receive under the formula in section 326(a) is $1,433,276.83, which is based on the distributions made while the case was in chapter 11.[66] Because the Trustee requested a lesser amount in the Application, the Court need not consider whether the maximum commission is warranted in this case.

The dispute here concerns whether the amount requested is reasonable compensation. To decide on the reasonableness of the Trustee's fees under either the adjusted-commission approach or the adjusted-compensation approach discussed above, the Court must consider whether the $1 million in fees requested by the

---

[65] 11 U.S.C. § 102(3).
[66] Application, ECF No. 407; 11 U.S.C. § 326(a).

Trustee should be adjusted based on the relevant factors listed in section 330(a)(3) and in *Johnson*. But under the adjusted-commission approach, the starting point of the analysis is the $1 million commission rather than a lodestar calculation.

## A. Under an adjusted-commission approach, the Trustee's requested compensation is reasonable.

As discussed above, the Court finds that the adjusted-commission approach is the best way to interpret the various provisions governing chapter 11 trustee compensation. Under this approach, the Court begins with the commission prescribed by section 326(a) and considers whether that amount should be adjusted based on all relevant factors, including the factors enumerated in section 330(a)(3) and in *Johnson*. Notably, here the Trustee has already requested an amount, $1 million, significantly less than the section 326(a) commission amount of more than $1.4 million. As the analysis below reflects, the Court finds that none of the relevant factors support an adjustment downward from the $1 million requested by the Trustee. To the contrary, the factors strongly support the reasonableness of the requested compensation.

### 1. Section 330(a)(3) Factors

#### a. Time Spent

According to the Application, the Trustee spent 545.80 hours working on this case. The Debtor did not challenge the Trustee's time and the Court has reviewed the billing records and finds that the time spent was appropriate given the facts of this case. This factor supports the requested compensation.

#### b. Rates Charged

The Trustee first calculated her fee using the commission-based calculation in section 326(a) and determined that her maximum fee would be $1,433,276.83. She then voluntarily reduced her requested commission to $1,000,000, which results in an effective hourly rate of $1,832.17. This rate is not particularly high as compared with other similar cases involving chapter 11 trustees, as discussed below. This factor supports the requested compensation.

#### c. Necessary Services

As stated, the parties do not dispute that the Trustee's services were necessary, and the Court agrees. When the Trustee was appointed, this case was already on a

deadline. The maturity date of the DIP Loan was nine months away and the only hope of paying off the loan by the maturity date was through a sale of the strip center. She had to quickly (a) secure the Debtor's funds and protect the property; (b) hire professionals to administer the case; (c) market the strip center for sale and sell the property quickly; (d) analyze the tax implications of the sale; and (e) operate the property as a going concern throughout the marketing and sale process. Many of these tasks were complicated and required negotiation with various entities.

Given the looming deadline to pay off the DIP Lender, failing to sell the property quickly likely would have resulted in foreclosure of the property and greatly reduced the funds available to pay creditors and professionals. Thus, the Trustee's services were certainly necessary. This factor supports the requested compensation.

### d.  Reasonable Amount of Time

As stated, the parties do not dispute that the Trustee's time was reasonable, and the Court agrees. The Trustee quickly determined that a sale of the property was in the best interests of creditors and the estate given the looming maturity date of the DIP Loan. She then spent months negotiating a sale to avoid foreclosure of the property, while facing various complications that dragged out the sale process. This factor supports the requested compensation. No reduction is needed based on this factor.

### e.  Skill and Experience

As discussed above, although arguably Congress has not required courts to consider this factor in every request for chapter 11 trustee compensation, it may be considered when relevant. Here, given the complex bankruptcy law issues that provided a backdrop for all of her decisions, the Trustee's skill and experience are relevant. The Trustee has been a bankruptcy attorney for twenty-eight years and has served as a chapter 7 panel trustee in the Northern District of Texas since 2019. During her career, she has also represented many trustees and has recently served as a chapter 11 trustee in several cases. This factor supports the requested compensation.

### f.  Customary Compensation Outside of Bankruptcy

This case involved the liquidation of a large commercial property. In the *Met Center* case, the court applied a 1% commission to the sale price to reflect

compensation customary for such a transaction.[67] In that case, however, the sale process lasted only two weeks. This case was more complicated. The Trustee had to operate the business for eleven months and engage in a prolonged sale process that was exacerbated by various issues, including the Affiliate failing to close and the Affiliate and Debtor's appeal of the sale order. Thus, applying a typical broker's commission analysis here does not reflect customary compensation for the type of work performed by the Trustee. Under the facts of this case, awarding compensation more in line with the presumptively reasonable fee the Trustee would have been entitled to had she converted this case to chapter 7 is appropriate.

In this case, the Court finds that applying an effective commission of a little more than 2% reasonably reflects customary compensation outside of bankruptcy, in light of the circumstances as a whole, especially when it is less than the commission calculated using the formula in section 326(a). This factor supports the requested compensation.

### 2. *Johnson* Factors

To the extent the *Johnson* factors have not been incorporated into the section 330(a)(3) analysis above, the Court finds that they also support the reasonableness of the Trustee's requested fees.

#### a. Time and Labor Required

Per the Trustee's testimony, she spent substantial time and effort in this case due to the time pressure and needs of the various interested parties. She had to work evenings, weekends, and during scheduled vacations to meet those needs. This factor supports the requested compensation.

#### b. Novelty and Difficulty of the Questions

The Trustee's sale negotiations required analysis of several legal questions, including rejection of an easement, removal of tenant possessory rights, and tax issues. She also had to craft the ROFR procedure because of the real threat that an affiliate of the Debtor would drive up the bidding and then refuse to close. She also had to deal with difficult vandalism and security issues at the property and problems with securing insurance for the property. This factor supports the requested compensation.

---

[67] *In re WC Met Center, LLC*, 645 B.R. at 862.

### c. Skill Required

The Trustee was able to leverage her experience to negotiate compromises and solutions to the issues presented in this case, and her efforts to sell the Debtor's primary asset ultimately resulted a surplus estate. For example, the Trustee saw the difficulties other trustees had selling properties in affiliate cases and crafted the ROFR procedure to avoid similar difficulties. She was also able to facilitate negotiations between the parties, without which the Third-Party Buyer likely would have walked the sale. She also persuaded the DIP Lender to delay foreclosure so that she could close the sale. And she did not give up when the Debtor and Affiliate filed what appeared to be a meritless appeal of the sale order, jeopardizing closing with the Third-Party Buyer. Without her efforts, it seems likely that the DIP Lender would have foreclosed, leaving other creditors and perhaps administrative claims unpaid. Instead, we have a surplus estate. This factor supports the requested compensation.

### d. Preclusion of Other Employment

Although the Trustee was unable to pinpoint any specific engagements she had to reject because of her work on this case, she testified that she was required to spend a significant portion of her time to this case, thus necessarily limiting her ability to take on other work. She felt sure that there were matters she might have taken on if this case had not been so stressful and time consuming. This factor supports the requested compensation.

### e. Customary Fee

As already discussed, and as discussed further below, the only evidence presented regarding customary fees in cases like this demonstrates that the Trustee's requested fees are consistent with amounts awarded to chapter 11 trustees in other affiliate cases. This factor supports the requested compensation.

### f. Whether the Fee was Fixed or Contingent

Facing a looming foreclosure sale, the Trustee's fee was contingent to a certain extent. If she had not been able to sell the property, there was a real risk of foreclosure and an administratively insolvent estate that would have jeopardized her ability to collect her fee. As noted by the Debtor, the Trustee might have been able to surcharge the collateral under section 506(c), but whether she would have been successful is unknown. This factor supports the requested compensation.

### g. Time Limitations

As already discussed at length, the Trustee was operating under significant time constraints. When she became the Trustee, she had to quickly act to secure insurance for the property. She also faced a DIP Loan that was set to mature in about nine months. To pay off the loan by the maturity date and avoid foreclosure, she had to stabilize, market, and sell the property quickly. This factor supports the requested compensation.

### h. Amount Involved and Results Obtained

The Trustee's efforts resulted in the sale of the shopping center for $47,500,000 during a time when the commercial real estate market had cooled and despite considerable legal and practical obstacles. She was able to prevent foreclosure and secure a surplus estate. This factor supports the requested compensation.

### i. Experience of the Trustee

The Trustee is an established bankruptcy attorney and trustee. She testified that she has been a bankruptcy lawyer since 1996 and has served as a panel trustee since 2019. She also clerked for two bankruptcy judges. This factor supports the requested compensation.

### j. Undesirability of the Case

The Trustee admitted that she does not consider this case undesirable but noted that she had to spend a significant amount of time working on this case, there were several difficult situations and personalities involved, and there was a risk of non-payment. This factor supports the requested compensation.

### k. Length of Professional Relationship with the Client

The Trustee was appointed on May 2, 2022, and continues working in this case as the chapter 7 trustee. She did not have a prior relationship with any party in interest in this case prior to her appointment. This factor does not particularly weigh one way or the other.

### l.  Awards in Similar Cases

As already discussed, the fees requested here are below the maximum fee allowed under section 326(a) and are consistent with the fees awarded in other, similar, affiliate cases. This factor supports the requested compensation.

### B.  Under an adjusted-compensation approach, the Trustee's requested compensation is reasonable.

As discussed above, the Court believes that the adjusted-commission approach is the appropriate method for determining the reasonableness of chapter 11 trustee fees. Although not necessary, out of an abundance of caution, the Court will analyze the Trustee's fees under the adjusted-compensation approach as well. The Court would also approve the Trustee's fees under this alternative approach taken by some courts.

Under the adjusted-compensation approach, the Court begins by conducting a lodestar analysis and then adjusts the amount calculated under the lodestar by applying the factors in section 330(a)(3) and *Johnson* to the extent they are not already considered in calculating the lodestar amount.

### 1.  Lodestar Analysis

To conduct a lodestar analysis, the Court begins by multiplying the number of hours worked by the prevailing hourly rate for similar work. But what is the prevailing hourly rate for similar work?

The Trustee testified that her typical hourly rate for attorney work is $650 an hour, which seems to be the prevailing hourly rate the Debtor would have the Court apply for the lodestar analysis. Using $650 an hour multiplied by the 545.80 hours the Trustee spent working on this case, the attorney-rate lodestar calculation is $354,770.

But the Trustee is not seeking compensation for attorney work; she is seeking compensation for her work as a trustee liquidating an estate. During the hearing, the Court took judicial notice of the effective hourly rates paid to chapter 11 trustees in other, similar, affiliate cases. The Trustee testified that to determine a reasonable fee for this case she looked for other cases in this district that were also single asset real estate cases where the assets were sold by a chapter 11 trustee. She identified two

such cases: *In re WC Braker Portfolio, LLC* and *In re WC Met Center, LLC*.[68] In those cases, the trustees were paid effective hourly rates of $2,393.00[69] and $3,497.00[70] respectively for their work. While these hourly rates are certainly higher than the prevailing hourly rate that bankruptcy attorneys charge in chapter 11 cases in this district, they are not unreasonable for liquidation work performed by a trustee.

In fact, if the Trustee had sought to convert this case to chapter 7, she likely would have performed the same work and been paid substantially more under the formula in section 326(a). During the hearing, the Trustee testified that she chose not to move for conversion to chapter 7 because she knew that doing so would drive up administrative expenses and reduce the distribution to unsecured creditors. She is correct. If the case had been converted before the property was sold, the Trustee's presumptively reasonable effective hourly rate would have been $2,626.

During the hearing, rather than present evidence of a lower prevailing rate in cases of this sort, the Debtor attempted to distinguish the two cases identified by the Trustee. But the limited testimony on this issue does not convince the Court that an effective hourly rate of about $1,800 is above the prevailing rate for the services the Trustee performed in this case. In fact, from the evidence presented, the Trustee's requested effective hourly rate of $1,832.17 is less than the prevailing hourly rate for similar Trustee work in this district. Using $1,832.17 as the hourly rate multiplied by 545.80 hours, the lodestar calculation results in the $1,000,000 in compensation the Trustee is requesting. The Court believes this is the correct calculation under these circumstances, and it requires no further adjustment based on the factors analyzed below.

But even assuming that the lodestar should be determined based on hourly rates for legal services, rather than the rates for trustees performing similar services as the Court believes is correct, an upward adjustment from the attorney-rate lodestar amount would be warranted, and the Trustee's requested compensation is reasonable. This conclusion is based on the analysis below.

The Debtor does not dispute that the Trustee's fees should be adjusted up from $354,770, given the difficulties in this case. It contends that the Trustee's effective

---

[68] Case Nos. 22-10293 and 21-10698.

[69] *In re WC Braker Portfolio, LLC*, Case No. 22-10293, Order Allowing Compensation for Dawn Ragan, ECF No. 396 (authorizing fees of $1,750,000 for 731.3 hours of work).

[70] *In re WC Met Center, LLC*, 645 B.R. at 864 (authorizing fees of $437,124.46 for 125 hours of work).

hourly rate should be $800 for total compensation of $440,000. This is a dispute only over how much of an upward adjustment is warranted.

## 2. **Section 330(a)(3) Factors**

### a. **Time Spent**

This factor is discussed in the lodestar analysis above. It supports the Trustee's requested compensation.

### a. **Rates Charged**

This factor is discussed in the lodestar analysis above. It supports the Trustee's requested compensation based on effective rates in comparable cases.

### b. **Necessary Services**

To the extent this factor is not incorporated in the lodestar analysis, it also supports the Trustee's requested compensation and would support an upward adjustment from the attorney-rate lodestar.

### c. **Reasonable Amount of Time**

To the extent this factor is not incorporated in the lodestar analysis, it also supports the Trustee's requested compensation and would support an upward adjustment from the attorney-rate lodestar.

### d. **Skill and Experience**[71]

To the extent this factor is not incorporated in the lodestar analysis, it also supports the Trustee's requested compensation and would support an upward adjustment from the attorney-rate lodestar. As discussed already, the Trustee's skill in administering this estate resulted in a surplus in a case where administrative insolvency was a looming threat.

### e. **Customary Compensation Outside of Bankruptcy**

To the extent this factor is not incorporated in the lodestar analysis, it also supports the Trustee's requested compensation and would support an upward

---

[71] As discussed above, the Trustee's skill and experience are relevant and were accordingly considered here.

adjustment from the attorney-rate lodestar. As discussed, the fee requested by the Trustee is in line with fees awarded to other chapter 11 trustees in similar affiliate cases.

### 3. Analysis of Relevant *Johnson* Factors

Incorporating the factors and analysis above, the Court finds that the following additional *Johnson* factors would support an upward adjustment from the attorney-rate lodestar:[72]

#### a. Time and Labor Required

Although this factor is presumably incorporated in the lodestar calculation, this case presented rare and exceptional circumstances that warrant considering an upward adjustment based on this factor. Per the Trustee's testimony, she spent substantial time and effort in this case due to the time pressure and needs of the various interested parties. She had to work evenings, weekends, and during scheduled vacations to meet those needs. Because this case at times necessitated around-the-clock attention and infringed on the Trustee's personal life, this factor would support an upward adjustment from the attorney-rate lodestar.

#### b. Novelty and Difficulty of the Questions

Although this factor is also presumably incorporated in the lodestar calculation, this case presented rare and exceptional circumstances that warrant considering an upward adjustment based on this factor as well. This was no simple sale, due in part to tough negotiations with the Third-Party Buyer but also in large part to issues surrounding the conduct of the Debtor's principal and affiliate entities

---

[72] Several of the *Johnson* factors are incorporated in section 330(a)(3) and in the lodestar analysis. The Fifth Circuit has found that "[f]our of the *Johnson* factor—the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, and the results obtained from the litigation—are presumably fully reflected in the lodestar amount." *Pilgrim's Pride*, 690 F.3d at 655 (quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993)). "Although upward adjustments of the lodestar figure based on these [four] factors are still permissible, such modifications are proper only in certain rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts." *Id.* (quoting *Shipes*, 987 F.2d at 320). As discussed above, the Court finds that in the event that the compensation-based approach is warranted (instead of the adjusted-commission approach that the Court believes is correct), and in the event the lodestar is set based on the attorney rate (instead of the trustee rate that the Court believes is correct), then this case merits a "rare and exceptional" finding and warrants consideration of an upward adjustment to the $1,800 effective hourly rate requested by the Trustee.

owned by the Debtor's principal. The Trustee demonstrated her attention and care in managing this estate by researching the difficulties other Trustees had experienced in affiliate cases. She recognized the real threat that an affiliate of the Debtor would drive up the bidding and then refuse to close the sale. She then took affirmative steps to try and prevent that from happening again by crafting the ROFR procedure. The Debtor still managed to hinder the sale by exercising its ROFR and then failing to close, but the Trustee's forethought prevented disputes over the auction and sale price that may have completely derailed the sale and led to foreclosure. The Trustee's actions in this case would warrant an upward adjustment from the attorney-rate lodestar, especially since it was in large part the Debtor's own actions that complicated the sale process.

### c. Skill Required

Although this factor is also presumably incorporated in the lodestar calculation, this case presented rare and exceptional circumstances that warrant an upward adjustment based on this factor as well. In addition to the skill required to navigate the novel and difficult legal issues discussed above, the Trustee was able to leverage her experience to negotiate compromises and solutions to the issues presented in this case and her efforts to sell the Debtor's primary asset ultimately resulted a surplus estate.

She was able to facilitate negotiations between the parties without which the Third-Party Buyer likely would have walked the sale. She also persuaded the DIP Lender to delay foreclosure so that she could close the sale. And she did not give up when the Debtor and Affiliate filed what appeared to be a meritless appeal of the sale order, jeopardizing closing with the Third-Party Buyer. Without her efforts, it seems likely that the DIP Lender would have foreclosed, leaving other creditors and perhaps administrative claims unpaid. Instead, we have a surplus estate. Again, the Trustee's actions in this case would warrant an upward adjustment from the attorney-rate lodestar, especially since it was in large part the Debtor's own actions that threatened the sale process.

### d. Preclusion of Other Employment

Although the Trustee was unable to pinpoint any specific engagements she had to reject because of her work on this case, she testified that she was required to spend a significant portion of her time to this case—including nights, weekends, and vacations—thus necessarily limiting her ability to take on other work. She felt sure that there were matters she might have taken on if this case had not been so stressful

and time consuming. This factor would also support an upward adjustment from the attorney-rate lodestar.

### e. Customary Fee

As already discussed, he Trustee's requested fees are consistent with amounts awarded to chapter 11 trustees in other affiliate cases. In the event the lodestar is set based on the attorney rate (instead of the trustee rate that the Court believes is correct), this case merits a "rare and exceptional" finding and warrants consideration of an upward adjustment to the $1,800 effective hourly rate requested by the Trustee.

### f. Whether the Fee was Fixed or Contingent

Facing a looming foreclosure sale, the Trustee's fee was contingent to a certain extent. If she had not been able to sell the property, there was a real risk of foreclosure and an administratively insolvent estate that would have jeopardized her ability to collect her fee. As noted by the Debtor, the Trustee might have been able to surcharge the collateral under section 506(c), but whether she would have been successful is unknown. This factor would support an upward adjustment from the attorney-rate lodestar.

### g. Time Limitations

As already discussed at length, the Trustee was operating under significant time constraints. When she became the Trustee, she had to quickly act to secure insurance for the property. She also faced a DIP Loan that was set to mature in about nine months. To pay off the loan by the maturity date and avoid foreclosure, she had to stabilize, market, and sell the property quickly. This factor would strongly support an upward adjustment from the attorney-rate lodestar.

### h. Amount Involved and Results Obtained

Although this factor is also presumably incorporated in the lodestar calculation, this case presented rare and exceptional circumstances that warrant considering an upward adjustment based on this factor as well. The Trustee's efforts resulted in the sale of the shopping center for $47,500,000 during a time when the commercial real estate market had cooled. She was able to prevent foreclosure and secure a surplus estate. She also negotiated a commission structure with the broker that resulted in the surplus estate. Had she gone with the 3% flat commission advocated for by the Debtor, any surplus would have gone to the broker. This factor supports an upward adjustment to the attorney-rate lodestar.

### i. Experience of the Trustee

The Court considered and discussed this factor above. It is incorporated in the lodestar analysis.

### j. Undesirability of the Case

The Court considered and discussed this factor above. It would be neutral under an upward adjustment analysis.

### k. Length of Professional Relationship with the Client

The Court considered and discussed this factor above. It would be neutral under an upward adjustment analysis.

### l. Awards in Similar Cases

The Court considered and discussed this factor above. The fees requested here are below the maximum fee allowed under section 326(a) and are consistent with the fees awarded in other, similar, affiliate cases. This factor would support an upward adjustment from the attorney-rate lodestar.

## Conclusion

For the reasons stated above, under either an adjusted-commission approach or under an adjusted-compensation approach, the Court finds that the Trustee's requested fee of $1,000,000.00 is reasonable and should be approved. There was no dispute over the Trustee's requested expenses, and they also appear reasonable, so the Court finds that they should be allowed as well. The Court will enter a separate order granting the Application.

# # #